UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | **CRIMINAL COMPLAINT** |
| v. : | Mag. No. 16-6005 (SCM) |
| CHRISTOPHER THIEME, : <br> a/k/a "John Thieme" : | |

I, Elizabeth White, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Special Agent Elizabeth White
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
January 5, 2016, Essex County, New Jersey

HONORABLE STEVEN C. MANNION
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

## ATTACHMENT A

### COUNT ONE
### (Murder-for-Hire)

From at least as early December 2015 through on or about January 4, 2016, in Sussex County, in the District of New Jersey, and elsewhere, the defendant,

CHRISTOPHER THIEME,
a/k/a "John Thieme,"

did knowingly use and cause another to use the facilities of interstate or foreign commerce, with the intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for, a promise or agreement to pay a thing of pecuniary value, in violation of Title 18, United States Code, Section 1958(a).

### COUNT TWO
### (Attempted Kidnapping)

On or about January 4, 2016, in Sussex County, in the District of New Jersey and elsewhere, the defendant,

CHRISTOPHER THIEME,
a/k/a "John Thieme,"

did knowingly and unlawfully attempt to seize, confine, inveigle, decoy, kidnap, abduct, and hold a person for ransom, reward, and otherwise, that is to kidnap and commit theft of property from Victim 1, and, in committing and in furtherance of the commission of the offense, used means, facilities, and instrumentalities of interstate and foreign commerce, contrary to Title 18, United States Code, Section 1201(a), in violation of Title 18, United States Code, Section 1201(d).

## ATTACHMENT B

I, Elizabeth White, am a Special Agent with the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, recordings, documents, and other items of evidence. Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause.

1. From at least as early as December 2015 through on or about January 4, 2016, defendant CHRISTOPHER THIEME, a/k/a "John Thieme" (hereinafter "THIEME"), who resides in Sussex County, New Jersey, contacted by telephone an individual (hereinafter "the individual") who was located in the State of Pennsylvania. During multiple telephone conversations and text message exchanges between THIEME and the individual in and around December 2015, THIEME advised the individual that he wanted a woman he knew to be kidnapped and then killed (hereinafter "the Victim"). THIEME asked the individual for assistance in kidnapping and murdering the Victim.

2. During the multiple telephone conversations and text messages exchanged during this time period, THIEME explained to the individual that THIEME wanted the Victim kidnapped and held for a week or two, during which time THIEME would empty the Victim's bank accounts and sell the Victim's real property for his own profit. THIEME further explained that he would use the proceeds from these thefts to pay the individual and whomever else the individual found to help kidnap and murder the Victim.

3. During this same time period, in order to facilitate the kidnapping and murder plot, THIEME sent text messages to the individual containing the Victim's identifying information, including the Victim's address, place of work, date of birth, height, weight, and other physical descriptors. Also, on or about December 14, 2015, THIEME emailed the individual two photographs of the Victim.

4. Believing THIEME to be serious about the kidnapping and murder plot, the individual contacted federal authorities without THIEME's knowledge, and immediately began cooperating with agents from the Federal Bureau of Investigation ("FBI").

5. On or about December 22, 2015, the individual, operating under the direction of FBI agents, placed a consensually-recorded call to THIEME. During the call, the individual informed THIEME that, if THIEME was still serious about following through on the kidnapping and murder plan, the individual would bring his "friend Danny" to meet THIEME after Christmas. THIEME confirmed that, "Number one, I definitely still want this," and "Number two, he's not going to be wasting his time. I'm very in."

6. On or about December 28, 2015, THIEME sent a text message to the individual, who was located in Pennsylvania at the time, indicating that THIEME was losing patience with the pace of the operation and that, in sum and substance, "Otherwise it's just a 6 week long conversation that got no where (sic) and I might as well just drive to Paterson shoot her and still have nothing for it but revenge."

7. On or about January 3, 2016, at a meeting in Newton, New Jersey, the individual introduced THIEME to an undercover FBI agent posing as a hitman named "Danny" (hereinafter "the undercover hitman"), whom the individual had purportedly recruited at THIEME's request to assist in the kidnapping and murder of the Victim

8. During this meeting, which was recorded, THIEME agreed to pay $25,000 to the hitman, which THIEME explained would come from the proceeds of THIEME selling the Victim's home while the Victim was being held against her will by the hitman and the individual. THIEME also told the undercover hitman that the best time of day to kidnap the Victim would be around 4:00 p.m., after the Victim finished work.

9. During this same meeting, the following exchanged occurred, in sum and substance:[1]

> UNDERCOVER HITMAN: I mean, you want us to come in here and hold onto this bitch by the short hairs for a little while or do you want me to come in here and put a fucking bullet in this broad? I mean it's---
>
> THIEME: Just hold on to her for a couple of days and [inaudible] what happens is, everyone will get be paid and squared away, whatever your, whatever, whatever you paid out for the plane ticket, for the hotel room, for any of the equipment [inaudible], when it comes down to it, she's got enough in her bank account, I can

---

[1] The following is a draft transcript only; it is not intended as a final transcript of the conversation.

4

probably get all that back to you within a day or two after she's snatched.

UNDERCOVER HITMAN: Yeah but that's what I'm sayin' man, I don't want to fucking leave this bitch laying around, witnesses, I'm not gonna, wear a, I'm not gonna wear a hood around this bitch all the time, you know what I'm saying? So, that's not how this shit works. I'm not, I'm not trying to tell you your business, but this is fucking my business, and I'm not gonna leave this broad laying around. So if you just want me to just babysit this broad, you got the wrong guy. You know what I'm saying? If you want me to snatch this bitch up and tie her down so she can sign documents for you and empty your bank account and all that bullshit, that's all well and good. But at the end of the day, you know what I'm saying? So-

THIEME:   She's still a witness.

UNDERCOVER HITMAN: She's still a fucking witness. So you need to tell what...what your intentions are here bro, if that's all your intentions are, is to fucking snatch this bitch up and hold onto her for a while, you gonna have to find somebody else 'cause I ain't gonna leave a fucking bitch on the street who's seen me after I snatched her up.

THIEME:   No, she's not going home after.

UNDERCOVER:   Ok. So long as we're clear about that.

THIEME:   She'll be, she'll be, she'll be sitting in a nice little hole until uh, until I take care of all the bank account stuff, and then I'm gonna make it look like she had heroin overdose.

10. Also during this same meeting, THIEME arranged with the individual and the undercover hitman to meet THIEME the next morning, January 4, 2016, so that THIEME could show the men the Victim's home and also identify other places the Victim frequents, in order to facilitate the kidnapping.

11. On or about January 4, 2016, THIEME met the individual and the undercover hitman as planned, and drove with the men to the Victim's

residence, as well as to other locations frequented by the Victim. The conversations during this meeting were recorded.

12. When informed that the undercover hitman and the individual would be ready to kidnap the Victim later that day, THIEME stated, in sum and substance, that he was ready to proceed.

13. Following this meeting, the undercover hitman and the individual dropped off THIEME in Caldwell New Jersey. FBI agents apprehended THIEME shortly thereafter.

14. The investigation has also revealed that THIEME had previously met the Victim through an online dating service in or around November 2015. Following approximately two dates, the Victim attempted to cut off contact with THIEME.